Todd Kim
Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice

David L. Dain
Senior Counsel
Environmental Enforcement Section
U.S. Department of Justice
999 18th Street, South Terrace, Suite 370
Denver, Colorado
(303) 844-7371
david.dain@usdoj.gov

Joseph H. Harrington
Acting United States Attorney
Eastern District of Washington
John T. Drake
Assistant United States Attorney
920 W. Riverside Ave, # 300
Spokane, WA 99210-1494
Telephone:  (509) 835-6347
jtdrake@usa.doj.gov

Attorneys for Plaintiff United States

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>Plaintiff,<br><br>v.<br><br>MULTISTAR INDUSTRIES, INC.<br><br>Defendant. | Civil No.<br><br>COMPLAINT |

United States of America Complaint - 1

1    The United States of America ("United States"), by the authority of the

2   Attorney General of the United States, on behalf of the United States Environmental

3   Protection Agency ("EPA"), alleges as follows:

4                                **NATURE OF ACTION**

5         1.      This is a civil action for injunctive relief and civil penalties brought

6   against Multistar Industries, Inc. ("Multistar" or "Defendant") under Section

7   113(b) of the Clean Air Act ("CAA"), 42 U.S.C. 7413(b), and Section 325(c) of

8   the Emergency Planning and Community Right-to-Know Act ("EPCRA"), 42

9   U.S.C. § 11045(c), alleging that Defendant violated the risk management program

10  requirements of CAA Section 112(r)(7), 42 U.S.C. § 7412(r)(7), and its

11  implementing regulations at 40 C.F.R. Part 68; and the chemical inventory

12  reporting requirements of EPCRA Section 312, 42 U.S.C. § 11022, and its

13  implementing regulations at 40 C.F.R. Part 370.

14                          **JURISDICTION AND VENUE**

15        2.      This Court has jurisdiction over the subject matter of this action

16  pursuant to 28 U.S.C. §§ 1331, 1345, 1355; CAA Section 113(b), 42 U.S.C.

17  § 7413(b); and EPCRA Section 325(c)(4), 42 U.S.C. § 11045(c)(4).  The Court has

18  personal jurisdiction over the parties.

19        3.      Venue lies in this judicial district pursuant to 28 U.S.C. §§ 1391(b)

20  and (c) and 1395(a); CAA Section 113(b), 42 U.S.C. § 7413(b); and EPCRA

    Section 325(c)(4), 42 U.S.C. § 11045(c)(4), because the violations occurred in, and

Defendant conducts business in, this judicial district.

4.     Authority to bring this civil action is vested in the Attorney General of the United States, pursuant to 28 U.S.C. §§ 516 and 519; CAA Sections 113(b) and 305, 42 U.S.C. §§ 7413(b) and 7605; and EPCRA Sections 325(c)(4), 42 U.S.C. § 11045(c)(4).

## NOTICE TO STATE

5.     Notice of the commencement of this action has been provided to the State of Washington as provided in CAA Section 113(b), 42 U.S.C. § 7413(b).

## PARTIES

6.     Plaintiff is the United States of America, acting at the request of the EPA, an agency of the United States.

7.     Defendant is a Washington corporation that has at all times relevant to this Complaint owned or operated a chemical storage and distribution business ("Facility") in Othello, Washington, which has a population of approximately 8,000 and is located in Adams County.

8.     Defendant is a "person" under CAA Section 302(e), 42 U.S.C. § 7602(e); EPCRA Section 329(7), 42 U.S.C. § 11049(7); and 40 C.F.R. § 370.66.

## STATUTORY AND REGULATORY FRAMEWORK

CLEAN AIR ACT RISK MANAGEMENT PROGRAM REQUIREMENTS

9.     Section 112(r) of the CAA, 42 U.S.C. § 7412(r), authorizes EPA to promulgate regulations and programs in order to prevent and minimize the consequences of accidental releases of certain regulated substances, including extremely hazardous substances.

10.     CAA Section 112(r)(7), 42 U.S.C. § 7412(r)(7), and Part 68[1] require the owner or operator of a stationary source at which a regulated substance is present in more than a threshold quantity in a single process to develop and implement a risk management plan ("RMP") and program to detect and prevent or minimize accidental releases of such substances from the stationary source and to provide a prompt emergency response to any such releases in order to protect human health and the environment.

11.     CAA Section 112(r)(2)(C), 42 U.S.C. § 7412(r)(2)(C), and 40 C.F.R. § 68.3 define "stationary source" as any buildings, structures, equipment, installations, or substance emitting stationary activities that belong to the same industrial group, are located on one or more contiguous properties, are under the control of the same person (or persons under common control), and from which an accidental release may occur.  See also 40 C.F.R. § 68.3 (definition of stationary source).  The definition in 40 C.F.R. § 68.3 goes on to provide that:

---

[1] Part 68 was revised in 2019.  With a few exceptions specifically noted, the revisions only resulted in renumbering of provisions relevant to this Complaint.  Citations are to the version of Part 68 currently in effect, with a notation, where applicable, to the citation in effect at the time the violation began.

1    The term stationary source does not apply to transportation, including

2    storage incident to transportation, of any regulated substance or any other

3    extremely hazardous substance under the provisions of this part [68].  A

4    stationary source includes transportation containers used for storage not

5    incident to transportation and transportation containers connected to

6    equipment at a stationary source for loading or unloading.  Transportation

7    includes, but is not limited to, transportation subject to oversight or

8    regulation under 49 CFR parts 192, 193, or 195, or a state natural gas or

9    hazardous liquid program for which the state has in effect a certification to

10    [United States Department of Transportation ("DOT")] under 49 U.S.C.

11    section 60105.  A stationary source does not include naturally occurring

12    hydrocarbon reservoirs.  Properties shall not be considered contiguous solely

13    because of a railroad or pipeline right-of-way.

14        12.    "Threshold quantity" is the quantity specified for regulated substances

15    pursuant to CAA Section 112(r)(5), listed in 40 C.F.R. § 68.130 and determined to

16    be present at a stationary source as specified in 40 C.F.R. § 68.115.

17        13.    40 C.F.R. § 68.3 defines "covered process" as a "process" that has a

18    regulated substance present in more than a threshold quantity as determined under

19    40 C.F.R. § 68.115.

20

14.     Part 68 classifies covered processes into three program levels to ensure that risk management program requirements appropriately match the size and risks of regulated processes.  Program 1 is the least comprehensive, and Program 3 is the most comprehensive. 40 CFR § 68.10(f), (g) and (h).

15.     Under 40 C.F.R. §68.10(a), except in circumstances not relevant to this action, an owner or operator of a stationary source that has more than a threshold quantity of a regulated substance in a process, as determined under 40 C.F.R. § 68.115, shall comply with the requirements of Part 68 no later than the latest of the following dates:  (1) June 21, 1999; (2) Three years after the date on which a regulated substance is first listed under 40 C.F.R. § 68.130; (3) The date on which a regulated substance is first present above a threshold quantity in a process; or (4) For any revisions to Part 68, the effective date of the final rule that revises Part 68.

16.     Trimethylamine ("TMA") is listed as a regulated substance under CAA Section 112(r)(3), 42 U.S.C. § 7412(r)(3), and 40 C.F.R. §§ 68.3 and 68.130, with a threshold quantity of 10,000 pounds.

## EPCRA SECTION 312
## CHEMICAL INVENTORY REPORTING REQUIREMENTS

17.     EPCRA establishes requirements for federal, state and local governments and industry regarding emergency planning for, and reporting on, hazardous and toxic chemicals.

United States of America Complaint - 6

18.    Section 312(a) of EPCRA, 42 U.S.C. § 11022(a), and its implementing regulations at 40 C.F.R. Part 370 require the owner or operator of a facility which is required to prepare or have available a safety data sheet ("SDS")[2] for a hazardous chemical under the Occupational Safety and Health Administration ("OSHA") Act of 1970 to prepare and submit annually by March 1 of each year a completed emergency and hazardous chemical inventory form ("Inventory Form") to the State Emergency Response Commission ("SERC"), the appropriate Local Emergency Planning Committee ("LEPC"), and the fire department with jurisdiction over the facility, addressing each such hazardous chemical that is present at the facility at any time during the previous calendar year in amounts that meet or exceed the threshold level for that chemical.

19.    The Inventory Form may either be aggregate information by hazard category ("Tier I") or specific information by chemical ("Tier II") and must contain the information required by EPCRA Section 312(d), 42 U.S.C. § 11022(d), and 40 C.F.R. § 370.40 for all such hazardous chemicals.

20.    The OSHA Hazard Communication Standard ("OSHA Standard"), 29 C.F.R. § 1910.1200, requires employers to provide information to their employees about hazardous chemicals to which they are exposed by means of, inter alia, an SDS.  29 C.F.R. § 1910.1200(b).  This regulation applies to any chemical which is

---

[2] Referred to under EPCRA Section 312 as a "Material Data Safety Sheet," and now referred to under the regulations as a "Safety Data Sheet."

United States of America Complaint - 7

1  known to be present in the workplace in such a manner that employees may be

2  exposed under normal conditions of use or in a foreseeable emergency.

3      21.    With certain exceptions not relevant here EPCRA Section 312(c),

4  42 U.S.C. § 11022(c), and 40 C.F.R. § 370.66 provide that "hazardous chemical"

5  means any hazardous chemical as defined under OSHA regulations at 29 C.F.R. §

6  1910.1200(c).

7      22.    OSHA regulations at 29 C.F.R. § 1910.1200(c) define "hazardous

8  chemical" as any chemical which is classified as a physical hazard or a health

9  hazard, a simple asphyxiant, combustible dust, pyrophoric gas, or hazard not

10  otherwise classified.

11      23.    An "extremely hazardous substance" is a subset of "hazardous

12  chemicals" and is defined at 40 C.F.R. § 370.66 as a substance listed in 40 C.F.R.

13  Part 355, Appendix A or B.

14      24.    40 C.F.R. § 370.10(a)(1) provides that the threshold quantity that

15  triggers reporting obligations under EPCRA Section 312 for an extremely

16  hazardous substance is 500 pounds, or the threshold planning quantity, as listed in

17  40 C.F.R. Part 355, Appendix A or B, whichever is lower, at a facility at any one

18  time.

19      25.    40 C.F.R. § 370.10(a)(2) provides that the threshold quantity that

20  triggers reporting obligations under EPCRA Section 312 for a hazardous chemical

that is not an extremely hazardous substance is 10,000 pounds at a facility at any one time, unless the hazardous chemical is gasoline or diesel fuel at a retail gas station.

26.    Under EPCRA Section 327, 42 U.S.C. § 11047, the reporting requirements of EPCRA Section 312 do not apply to the transportation, including the storage incident to such transportation, of any substance or chemical subject to EPCRA, including the transportation and distribution of natural gas.

27.    Section 329(4) of EPCRA, 42 U.S.C. § 11049(4), and 40 C.F.R. § 370.66 define "facility" as all buildings, equipment, structures, and other stationary items located on a single site or on contiguous or adjacent sites and which are owned or operated by the same person (or by any person which controls, is controlled by, or under common control with, such person).  The regulatory definition goes on to provide that "facility" includes manmade structures, as well as all natural structures in which chemicals are purposefully placed or removed through human means such that it functions as a containment structure for human use.  40 C.F.R. § 370.66.

28.    40 C.F.R. § 370.66 defines "SERC" as the State Emergency Response Commission for the state in which the facility is located, except when the facility is located in Indian Country.

29.     40 C.F.R. § 370.66 defines "LEPC" as the Local Emergency Planning Committee appointed by the SERC.

30.     TMA is a hazardous chemical as defined at 29 C.F.R. § 1910.1200(c) and is on the list of chemicals regulated by OSHA as hazardous chemicals.  See "Guidance for Hazard Determination for Compliance with the OSHA Hazard Communication Standard (29 CFR 1910.1200)."

31.     The OSHA Standard requires an SDS to be prepared or made available for TMA.

32.     TMA is not an extremely hazardous substance listed in 40 C.F.R. Part 355, Appendix A or B.  Therefore, the reporting threshold for TMA is 10,000 pounds.

## **GENERAL ALLEGATIONS**

### The Defendant and the Facility

33.     Defendant has at all relevant times been the "owner or operator" (as those terms are defined in CAA Section 112(a)(9), 42 U.S.C. § 7412(a)(9), and EPCRA Section 312, 42 U.S.C. § 11022) of the Facility located at 101 West Fir Street, Othello, Washington 99344.

34.     Defendant accepts chemicals, including TMA, by railcar and/or truck at the Facility, stores the chemicals on site at the Facility, and then sells and/or distributes the chemicals to third parties.

35.    The Washington SERC is established pursuant to EPCRA Section 301(a), 42 U.S.C. § 11001(a).

36.    The Washington State Department of Ecology is responsible for managing and maintaining records required to be submitted under EPCRA to the Washington SERC by facilities in Washington State.

37.    The Adams County LEPC is the local emergency planning committee established pursuant to EPCRA Section 301(c), 42 U.S.C. § 11001(c), for Adams County by the Washington SERC, and is responsible for managing and maintaining records required to be submitted under EPCRA to the LEPC by facilities in Adams County, Washington.

38.    Adams County Fire District No. 5 ("Fire Department") is responsible for responding to emergency situations within the City of Othello, including at the Facility, and has jurisdiction over the Facility.

39.    Defendant's ammonia storage and distribution process has been subject to CAA Section 112(r)(7) and 40 C.F.R. Part 68 since June 21, 1999.

40.    Defendant has filed RMPs identifying its ammonia storage distribution process as a covered process since approximately 2004.

41.    In January 2019, EPA learned that, as of September 7, 2018, Defendant had on site at the Facility a railcar filled with TMA and appeared to be unloading the TMA into a truck.

42.     Subsequent investigations by EPA revealed that more than 10,000 pounds of TMA had been on site at the Facility since some time in 2017.

<u>TMA Covered Process</u>

43.     From some time in 2017 to the present, numerous tank railcars containing TMA have been and continue to be delivered to a private railroad track (referred to as a "private rail siding") at the Facility.

44.     Once delivered to the Facility, the tank railcars containing TMA are disconnected from motive power.

45.     Defendant uses a transloader, associated transfer hoses, and related equipment to transfer TMA from the tank railcars to trucks for delivery to a third party.

46.     From some time in 2017 to the present, Defendant transferred and continues to transfer TMA from tank railcars located at the Facility into trucks for delivery of the TMA to a third party on numerous occasions.

47.     Defendant has at all relevant times been the "owner or operator" (as those terms are defined in CAA Section 112(a)(9), 42 U.S.C. § 7412(a)(9), and EPCRA Section 312, 42 U.S.C. § 11023) of the tank railcars containing TMA while the railcars are located at the Facility, as well as the transloader, associated transfer hoses, trucks, and related equipment used to store and transfer TMA to trucks and the trucks used to deliver TMA to a third party.

48.    The tank railcars containing TMA are "transportation containers used for storage not incident to transportation" within the meaning of the definition of "stationary source" in 40 C.F.R. § 68.3 for at least some time while at the Facility.

49.    The tank railcars containing TMA are "transportation containers connected to equipment at a stationary source for loading or unloading" within the meaning of the definition of "stationary source" in 40 C.F.R. § 68.3 while the TMA is being transferred from the tank railcars to trucks at the Facility.

50.    The tank railcars containing TMA are not under active shipping papers for at least some time while at the Facility.

51.    The tank railcars containing TMA are not in "storage incident to transportation" within the meaning of 40 C.F.R. § 68.3 for at least some time while at the Facility.

52.    The tank railcars containing TMA are not in "storage incident to such transportation" within the meaning of EPCRA Section 327, 42 U.S.C. § 11047, for at least some time while at the Facility.

53.    When TMA is being transferred from the tank railcars to trucks at the Facility, the tank railcars containing TMA, the transloader, the trucks, and other related equipment can be, and at times are, interconnected and thus constitute a single "process" ("TMA storage and distribution process"), as defined in 40 C.F.R. § 68.3.

54.    TMA was first present at the Facility above 10,000 pounds in the TMA storage and distribution process sometime in 2017, and this covered process became subject to the requirements of Part 68 at that time.

55.    At all relevant times, Defendant's TMA storage and distribution process has been and continues to be a "covered process" as defined in 40 C.F.R. § 68.3, and subject to 40 C.F.R. Part 68 ("TMA Covered Process").

56.    On June 6, 2019, Defendant filed an updated RMP that identifies the TMA Covered Process as a Program 3 covered process with a maximum capacity of 156,988 pounds of TMA, well above the threshold quantity of 10,000 pounds in a single process.

57.    Defendant filed revised EPCRA Section 312 Inventory Forms for the Facility that included TMA for reporting year 2017 with the SERC, the Adams County LEPC, and the Fire Department on approximately June 6, 2019, reporting that the Facility had a maximum inventory of 156,988 pounds of TMA and an average inventory of 156,988 pounds of TMA during calendar year 2017.

58.    Defendant filed revised EPCRA Section 312 Tier II Inventory Forms for the Facility that included TMA for reporting year 2018 with the SERC, the Adams County LEPC, and the Fire Department on approximately June 6, 2019, reporting that the Facility had a maximum inventory of 696,380 pounds of TMA, and an average inventory of 156,988 pounds of TMA during calendar year 2018.

59.     Defendant filed EPCRA Section 312 Inventory Forms for the Facility for reporting year 2019 that included TMA with the SERC, the Adams County LEPC, and the Fire Department on approximately January 29, 2020, reporting that the Facility had a maximum inventory of 1,413,000 pounds of TMA and an average inventory of 628,000 pounds of TMA.

60.     Defendant filed EPCRA Section 312 Inventory Forms for the Facility for reporting year 2020 that included TMA with the SERC, the Adams County LEPC, and the Fire Department on approximately February 16 or 17, 2021, reporting that the Facility had a maximum inventory of 1,102,892 pounds of TMA and an average inventory of 628,000 pounds of TMA.

61.     Defendant's TMA Covered Process is subject to the OSHA Process Safety Management requirements in 29 C.F.R. § 1910.119.

62.     Defendant's TMA Covered Process is a Program 3 covered process.

63.     Based on Defendant's most recent RMP filing, a "worst-case release" as defined in 40 C.F.R. § 68.3 from its TMA Covered Process, based on an inventory of 156,988 pounds of TMA, would affect approximately 914 people in the vicinity of the Facility.

64.     Based on the operations conducted at the Facility, an "accidental release" (as defined in CAA Section 112(r)(2)(A), 42 U.S.C. § 7412(r)(2)(A), and 40 C.F.R. § 68.3) of TMA may occur from the Facility.

United States of America Complaint - 15

65.    The Facility is a "stationary source" as defined in CAA Section 112(r)(2)(C), 42 U.S.C. § 7412(r)(2)(C), and 40 C.F.R. § 68.3.

## FIRST CLAIM FOR RELIEF

*(CAA Section 112(r):  Failure to Update RMP for TMA Covered Process)*

66.    Under 40 C.F.R. § 68.190(a) and (b)(4), the owner or operator of a stationary source subject to Part 68 shall review and update the RMP submitted under 40 C.F.R. § 68.150 no later than the date on which a regulated substance is first present above a threshold quantity in a new process.

67.    Defendant did not update and submit to EPA a revised RMP that included the TMA Covered Process until June 6, 2019 even though more than 10,000 pounds of TMA was first present at the Facility in the TMA Covered Process beginning sometime in 2017.

68.    Defendant therefore failed to timely update and submit to EPA a revised RMP as required, in violation of 42 U.S.C. § 7412(r)(7) and 40 C.F.R. § 68.190(a) and (b)(4).

## SECOND CLAIM FOR RELIEF

*(CAA Section 112(r):  Failure to Conduct a Hazard Assessment)*

69.    Under 40 C.F.R. § 68.20, the owner or operator of a stationary source subject to 40 C.F.R. Part 68 shall prepare a worst-case release scenario analysis as provided in 40 C.F.R. § 68.25 and complete the five-year accident history as

1   provided in 40 C.F.R. § 68.42.  In addition, the owner or operator of a Program 2

2   or 3 covered process shall comply with 40 C.F.R. §§ 68.20 to 68.42 for all such

3   covered processes.

4       70.     The owner or operator of a Program 2 or Program 3 covered process

5   shall analyze and report in its RMP specified worst-case release scenarios resulting

6   from an accidental release of the regulated toxic or flammable substances under

7   worst-case conditions defined in 40 C.F.R. § 68.22 and shall also identify and

8   analyze at least one alternative release scenario for each regulated toxic substance

9   held in covered processes and at least one alternative release scenario to represent

10  all flammable substances held in covered processes as specified in 40 C.F.R.

11  § 68.28, all in the manner specified in 40 C.F.R. §§ 68.20 to 68.42.

12      71.     In response to an EPA Information Request issued to Defendant on

13  March 1, 2019 ("March 2019 Information Request") requesting any worst-case

14  release scenarios, alternative release scenarios, or off-site consequence analyses

15  conducted for the Facility with respect to TMA, Defendant submitted to EPA an

16  off-site consequence analysis dated May 24, 2019.

17      72.     Defendant failed to conduct worst-case release scenarios resulting

18  from an accidental release of TMA from its TMA Covered Process under worst-

19  case conditions and to identify and analyze at least one alternative release scenario

20  for TMA, as provided in 40 C.F.R. §§ 68.20 to 68.42, prior to accepting delivery of

more than 10,000 pounds of TMA in its TMA Covered Process some time in 2017, in violation of 42 U.S.C. § 7412(r)(7) and 40 C.F.R. §§ 68.20 to 68.42.

### THIRD CLAIM FOR RELIEF

*(CAA Section 112(r):  Failure to Compile All Process Safety Information and Conduct a Process Hazard Analysis)*

73.      Under 40 C.F.R. § 68.65, the owner or operator of a Program 3 covered process shall complete a compilation of written process safety information before conducting any process hazard analysis ("PHA") required by Part 68.  The compilation of written process safety information is to enable the owner or operator and the employees involved in operating the process to identify and understand the hazards posed by the regulated processes involving the regulated substances.

74.      Under 40 C.F.R. § 68.65(b), (c), and (d), this process safety information shall include information pertaining to the hazards of the regulated substance in the process; the technology of the process; and the equipment in the process, with the regulation specifying for each category the specific information required to be compiled.

75.      Under 40 C.F.R. § 68.65(d)(2), as part of the process of compiling written process safety information for equipment in the process, the owner or operator shall document that equipment complies with recognized and generally accepted good engineering practices ("RAGAGEP").

United States of America Complaint - 18

76.    Under 40 C.F.R. § 68.67, the owner or operator of a stationary source with a Program 3 covered process shall perform an initial PHA on such process that is appropriate to the complexity of the process; identifies, evaluates, and controls the hazards involved in the process; uses one or more of the methodologies specified by 40 C.F.R. § 68.67(b) that are appropriate to determine and evaluate the hazards of the process being analyzed; addresses the elements in 40 C.F.R. § 68.67(c); and is performed by a team with expertise in engineering and process operations and meeting the requirements of 40 C.F.R. § 68.67(d).  The owner or operator shall also promptly address the findings and recommendations of the PHA as provided in 40 C.F.R. § 68.67(e).

77.    Under 40 C.F.R. § 68.67(g), the owner or operator shall retain PHAs and updates or revalidations for each covered process, as well as the documented resolution of recommendations described in 40 C.F.R. § 68.67(e) for the life of the process.

78.    In light of the hazards posed by the mishandling of chemicals at industrial facilities, industry trade associations have issued standards for the storage and handling of chemicals at such facilities.  For example, the Compressed Gas Association ("CGA") has published "Standard For Maintenance Of Transfer Hoses," 1st Ed., 2019.  The American National Standards Institute ("ANSI") and the American Society of Mechanical Engineers ("ASME") published ANSI/ASME

A13.1-2015, "Scheme for the Identification of Piping Systems." ASME has published ASME B31.3, "Process Piping," 2016 and 2018. National Fire Protection Association ("NFPA") 77, "Recommended Practice on Static Electricity," addresses identification, evaluation, and control of static electric hazards for purposes of preventing fires and explosions when explosive chemicals are involved. In addition, DOT regulations govern the specifications for tank railcars, 49 C.F.R. Part 179, and tank railcar unloading, 49 C.F.R. § 174.67. These standards and guidance, which are updated from time to time, represent RAGAGEP for Defendant's TMA Covered Process.

79.    EPA's March 2019 Information Request requested any process information specified in 40 C.F.R. § 68.65 for any process equipment storing or containing TMA and any PHA for TMA conducted pursuant to or meeting the requirements of 40 C.F.R. § 68.67, including any actions taken to address the findings and recommendations of such analysis.

80.    In response to EPA's March 2019 Information Request, Defendant submitted a June 3, 2019 "Process Hazard Analysis What-If Checklist" and process safety information for the TMA Covered Process.

81.    The process safety information submitted by Defendant on approximately June 6, 2019, in response to EPA's March 2019 Information

1  Request did not address the following requirements of 40 C.F.R. § 68.65 for the

2  TMA Covered Process:

a.  A block flow diagram or simplified process flow diagram for the

TMA Covered Process that shows the transfer hose connection to

the tank trailer trucks for unloading the TMA from the tank railcar.

See 40 C.F.R. § 68.65(c)(1)(i).

b.  Process chemistry.  See 40 C.F.R. § 68.65(c)(1)(ii).

c.  Safe upper and lower limits for items such as temperatures,

pressures, flows, or compositions.  See 40 C.F.R. § 68.65(c)(1)(iv).

d.  An evaluation of the consequences of deviations from safe upper

and lower limits.  See 40 C.F.R. § 68.65(c)(1)(v).

e.  Materials of construction for pressure relief valves, hoses, and tank

railcars.  See 40 C.F.R. § 68.65(d)(1)(i).

f.  Relief system design and basis for pressure relief valves.  See 40

C.F.R. § 68.65(d)(1)(iv).

g.  Design codes and standards employed.  See 40 C.F.R.

§ 68.65(d)(1)(vi).

h.  Material and energy balances.  See 40 C.F.R. § 68.65(d)(1)(vii).

i.  Safety systems, such as interlocks, detection, or suppression

systems.  See 40 C.F.R. § 68.65(d)(1)(viii).

j.   Documentation that the equipment in the TMA Covered Process

complies with RAGAGEP.  See 40 C.F.R. § 68.65(d)(2).

82.    As of the date of this Complaint, Defendant has not submitted to EPA

the process safety information identified in Paragraph 81 above.

83.    As of the date of this Complaint, Defendant has not submitted to EPA

information showing that it has resolved in a timely manner all recommendations

in its June 3, 2019 PHA.

84.    Defendant failed to timely complete a compilation of all required

written process safety information before conducting the PHA required by

40 C.F.R. § 68.67 for the TMA Covered Process, in violation of 42

U.S.C. § 7412(r)(7) and 40 C.F.R. § 68.65(c) and (d).  Based on information and

belief, these violations are continuing.

85.    Defendant failed to timely conduct a PHA meeting the requirements

of 40 C.F.R. § 68.67(a), (b), (c), and (d) for its TMA Covered Process and failed to

promptly address the findings and recommendations of its PHA, in violation of

42 U.S.C. § 7412(r)(7) and 40 C.F.R. § 68.67(a), (b), (c), (d), and (e).  Based on

information and belief, the violation of 40 C.F.R. § 68.67(e) is continuing.

FOURTH CLAIM FOR RELIEF

*(CAA Section 112(r):  Failure to Develop and Implement*
*Written Operating Procedures, Conduct Training, and*
*Establish and Implement Mechanical Integrity Procedures)*

86.    Under 40 C.F.R. § 68.69(a), the owner or operator of a Program 3 covered process shall develop and implement written operating procedures that provide clear instructions for safely conducting activities involved in each covered process consistent with the process safety information and shall address the operating phases identified in that section, as well as specified operating limits, safety and health considerations, and safety systems and their functions.  Under 40 C.F.R. § 68.69(c), the owner and operator shall certify annually that its operating procedures are current and accurate.

87.    Under 40 C.F.R. § 68.71(a)(1), each employee presently involved in operating a Program 3 covered process, and each employee before being involved in operating a newly assigned Program 3 covered process, shall be trained in an overview of the process and in the operating procedures as specified in 40 C.F.R. § 68.69.

88.    Under 40 C.F.R. § 68.71(c), the owner or operator of a Program 3 covered process shall ascertain that each employee involved in operating the process has received and understood the training required by 40 C.F.R. § 68.71 and

shall prepare a record which contains the identity of the employee, the date of training, and the means used to verify that the employee understood the training.

89.    Under 40 C.F.R. § 68.73(a) and (b), the owner or operator of a Program 3 covered process shall establish and implement written procedures to maintain the on-going integrity of pressure vessels and storage tanks, piping systems (including piping components such as valves), relief and vent systems and devices, emergency shutdown systems, controls (including monitoring devices and sensors, alarms, and interlocks), and pumps (collectively, "subject process equipment").

90.    Under 40 C.F.R. § 68.73(c), the owner or operator of a Program 3 covered process shall train each employee involved in maintaining the on-going integrity of process equipment in an overview of that process and its hazards and in the procedures applicable to the employee's tasks to assure that the employee can perform the job tasks in a safe manner.

91.    Under 40 C.F.R. § 68.73(d)(1) through (3), the owner or operator of a Program 3 covered process shall perform inspections and tests on subject process equipment using procedures that follow RAGAGEP at a frequency consistent with applicable manufacturers' recommendations and good engineering practices, and more frequently if determined to be necessary by prior operating experience.

92.     Under 40 C.F.R. § 68.73(d)(4), the owner or operator of a Program 3 covered process shall document each inspection and test that has been performed on subject process equipment, which documentation shall identify the date of the inspection or test, the name of the person performing the inspection or test, the serial number or other identifier of the equipment on which the inspection or test was performed, a description of the inspection or test performed, and the results of the inspection or test.

93.     EPA's March 2019 Information Request requested any written operating procedures for unloading, loading, or storing of TMA at the Facility, including procedures addressing normal operations, emergency shutdowns, and emergency operations; documentation of any training conducted at the Facility with respect to operating any TMA process; written procedures for maintaining the ongoing integrity of specified TMA process equipment; and documentation of any inspections, maintenance activities, or testing conducted on the TMA process equipment at the Facility.

*Operating Procedures*

94.     In response to EPA's March 2019 Information Request, Defendant submitted an operating procedure dated June 1, 2018, and an update to that procedure dated October 10, 2018.

95.     The operating procedures submitted to EPA by Defendant:

     a.  Do not address all safety systems and their functions as required by 40 C.F.R. § 68.69(a)(4);

     b.  Do not give clear instructions for safely conducting activities, as required by 40 C.F.R. § 68.69(a); and

     c.  Were not certified as current and accurate at the time they were submitted to EPA.

96.    As of the date of this Complaint, Respondent has not submitted to EPA operating procedures that address the deficiencies identified in Paragraph 95 above.

97.    Defendant failed to have in place operating procedures meeting the requirements of 40 C.F.R. § 68.69(a) prior to first unloading TMA from tank railcars into trucks some time in 2017 and failed to certify its operating procedures as current and accurate at least annually, in violation of 42 U.S.C. § 7412(r)(7) and 40 C.F.R. § 68.69(a) and (c). Based on information and belief, these violations are continuing.

*Training*

98.    In response to EPA's March 2019 Information Request, Defendant provided some records of some employee training for the TMA Covered Process.

99.    Based on the records provided, the training did not timely train employees in the operating procedures for the TMA Covered Process, as required by 40 C.F.R. § 68.71(a)(1).

100.    In addition, the training records provided do not give any indication that operators were trained in emergency operations, including shutdown, and safe work practices applicable to the employee's job tasks for the TMA Covered Process, as required by 40 C.F.R. § 68.71(a) and (c).

101.    As of the date of this Complaint, Defendant has not submitted to EPA information demonstrating that it is meeting the training requirements of 40 C.F.R. § 68.71(a) and (c) for the TMA Covered Process.

102.    Defendant failed to timely provide training meeting the requirements of 40 C.F.R. § 68.71(a) and (c) for its employees involved in operating the TMA Covered Process, in violation of 42 U.S.C. § 7412(r)(7) and 40 C.F.R. § 68.71(a) and (c).  Based on information and belief, these violations are continuing.

*Mechanical Integrity*

103.    In response to EPA's March 2019 Information Request, Defendant submitted an undated document entitled "Written Procedures for Maintaining Ongoing Integrity of Process Equipment – TMA" ("TMA MI procedure") and a document entitled "Transfer Facility Record of Maintenance and Inspection" ("TMA MI record") for the TMA Covered Process.

United States of America Complaint - 27

104.   The TMA MI procedure does not contain written procedures for maintaining the ongoing mechanical integrity of pressure relief devices (relief devices) and transfer hoses (piping systems), as required by 40 C.F.R. § 68.67(b).

105.   The TMA MI record does not include the following information required by 40 C.F.R. § 68.67(d)(4): (1) the serial number or other identifier of the equipment on which the inspection or test was performed; (2) a description of the inspection or test performed; or (3) results of the inspection or test.

106.   Based on records provided, Defendant did not conduct, or keep records of, inspections and tests at the frequency called for in its TMA MI procedure.

107.   As of the date of this Complaint, Defendant has not submitted to EPA information demonstrating that it is meeting the mechanical integrity requirements of 40 C.F.R. § 68.73(b) and (d) or the training requirements of 40 C.F.R. § 68.73(c).

108.   Defendant failed to have and implement written procedures for maintaining the ongoing integrity of subject process equipment meeting the requirements of 40 C.F.R. § 68.73(b) and (d), to adequately document each inspection and test performed on subject process equipment, and to train each employee involved in maintaining the on-going integrity of process equipment in

violation of 42 U.S.C. § 7412(r)(7) and 40 C.F.R. § 68.73(b), (c) and (d).  Based on information and belief, these violations are continuing.

### FIFTH CLAIM FOR RELIEF

*(CAA Section 112(r):  Failure to Meet Emergency Response Requirements)*

109.   Under 40 C.F.R. § 68.90(a), the owner or operator of a stationary source with a Program 2 or Program 3 covered process shall comply with the emergency response program requirements in 40 C.F.R. § 68.95 unless its employees will not be responding to accidental releases of regulated substances and the owner or operator complies with the requirements of 40 C.F.R. § 68.90(b) for nonresponding stationary sources.  The requirements of 40 C.F.R. § 68.90(b) for "nonresponding stationary sources" include ensuring, for stationary sources with any regulated toxic substances (such as ammonia) held in a process above the threshold quantity, that the stationary source is included in the community emergency response plan developed under 42 U.S.C. § 11003 and that, beginning September 21, 2018, the owner or operator performs the annual emergency response coordination activities required under 40 C.F.R. § 68.93.

110.   Effective September 21, 2018, as provided in 40 C.F.R. § 68.93, the owner or operator of a stationary source with a Program 2 or Program 3 covered process shall coordinate response needs with local emergency planning and response organizations at least annually to determine how the stationary source is

addressed in the community emergency response plan and to ensure that local

response organizations are aware of the regulated substances at the stationary

source, their quantities, the risks presented by covered processes, and the resources

and capabilities at the stationary source to respond to an accidental release of a

regulated substance.  See also 40 C.F.R. § 68.93(a).  Under 40 C.F.R. § 68.93(b),

coordination shall include providing to the local emergency planning and response

organizations the stationary source's emergency response plan if one exists;

emergency action plan; updated emergency contact information; and other

information necessary for developing and implementing the local emergency

response plan.

111.   The owner or operator shall document coordination with local

authorities, including the names of individuals involved and their contact

information (phone number, email address, and organizational affiliations); dates

of coordination activities; and nature of coordination activities, as provided in 40

C.F.R. § 68.93(c).

112.   EPA's March 2019 Information Request requested "A description of

any coordination and communications the Facility has had with local emergency

planning and response agencies regarding TMA stored at the Facility, including

whether the Facility is included in the community emergency response plan.

Provide supporting documentation of this coordination with respect to TMA,

1   including copies of any communications and the dates on which such coordination

2   and communications were conducted."

3      113.   Based on Defendant's response to EPA's March 2019 Information

4   Request, Defendant did not timely meet the requirements for a "non-responding

5   stationary source" under 40 C.F.R. § 68.90(b) with respect to its TMA Covered

6   Process because Defendant did not timely coordinate response needs with the

7   Adams County LEPC to ensure the LEPC was aware of the amount of TMA at the

8   Facility, the risk presented by TMA at the Facility, and Defendant's resources and

9   capabilities at the Facility to respond to an accidental release of TMA, or timely

10   provide the LEPA a copy of Defendant's Emergency Action Plan, as required by

11   40 C.F.R. § 68.93 (introductory paragraph) and (b).

12      114.   Such failures violated 42 U.S.C. § 7412(r)(7) and 40 C.F.R.

13   §§ 68.90(b) and 68.93.

14                     SIXTH CLAIM FOR RELIEF

15      *(EPCRA Section 312: Failure to timely submit 2017 Inventory Forms)*

16      115.   The Facility is a "facility" as defined in EPCRA Section 329(4),

17   42 U.S.C. § 11049(4), and 40 C.F.R. § 370.66.

18      116.   Defendant had more than 10,000 pounds of TMA present at the

19   Facility at any one-time during calendar year 2017.

20

117.    Defendant failed to submit to the Washington SERC a completed EPCRA Section 312 Inventory Form for calendar year 2017 that included TMA until approximately June 6, 2019.

118.    Defendant failed to submit to the Adams County LEPC a completed EPCRA Section 312 Inventory Form for calendar year 2017 that included TMA until approximately June 6, 2019.

119.    Defendant failed to submit to the Fire Department a completed EPCRA Section 312 Inventory Form for calendar year 2017 that included TMA until approximately June 6, 2019.

120.    Defendant failed to submit to the Washington SERC, the Adams County LEPC, and the Fire Department completed EPCRA Section 312 Inventory Forms for calendar year 2017 that included TMA by March 1, 2018, in violation of EPCRA Section 312(a), 42 U.S.C. § 11022(a) and 40 C.F.R. §§ 370.40 to 370.45.

## SEVENTH CLAIM FOR RELIEF

*(EPCRA Section 312:  Failure to timely submit 2018 Inventory Form for TMA)*

121.    Defendant had more than 10,000 pounds of TMA present at the Facility at any one-time during calendar year 2018.

122.    Defendant failed to submit to the Washington SERC a completed EPCRA Section 312 Inventory Form for calendar year 2018 that included TMA until approximately June 6, 2019.

United States of America Complaint - 32

123.    Defendant failed to submit to the Adams County LEPC a completed EPCRA Section 312 Inventory Form for calendar year 2018 that included TMA until approximately June 6, 2019.

124.    Defendant failed to submit to the Fire Department a completed EPCRA Section 312 Inventory Form for calendar year 2018 that included TMA until approximately June 6, 2019.

125.    Defendant failed to submit to the Washington SERC, the Adams County LEPC, and the Fire Department completed EPCRA Section 312 Inventory Forms for calendar year 2018 that included TMA by March 1, 2019, in violation of EPCRA Section 312(a), 42 U.S.C. § 11022(a) and 40 C.F.R. §§ 370.40 to 370.45.

## **Enforcement**

126.    Under CAA Section 113(b), 42 U.S.C. § 7413(b), the United States may bring a civil action against any person for a permanent or temporary injunction or to assess and recover a civil penalty whenever such person has violated or is in violation of any requirement or prohibition of the CAA referenced therein, including Section 112(r), 42 U.S.C. § 7412(r).

127.    CAA Section 113(b), 42 U.S.C. § 7413(b), authorizes a civil penalty of not more than $25,000 per day for each violation.  The statutory maximum civil penalty has been adjusted over time as required by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. § 2461), as amended by the Debt

Collection Improvement Act of 1996 (31 U.S.C. § 3701), and most recently, by the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015 (28 U.S.C. § 2461), as provided in 40 C.F.R. Part 19.

128.    Pursuant to CAA Section 113(b), 42 U.S.C. § 7413(b), and 40 C.F.R. Part 19, Defendant is liable for a civil penalty for the CAA violations alleged in this Complaint of not more than $102,638 per day per violation.

129.    Under EPCRA Section 325(c), 42 U.S.C. § 11045(c), the United States may bring an action to assess and collect a penalty in the United States District Court for the district in which the violator resides or in which the violator's principal place of business is located.

130.    EPCRA Section 325(c)(1) and (3), 42 U.S.C. § 11045(c)(1) and (3), authorize a civil penalty of up to $25,000 per day for each such violation and states that each day a violation continues constitutes a separate violation.  The statutory maximum civil penalty has been adjusted over time as required by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. § 2461), as amended by the Debt Collection Improvement Act of 1996 (31 U.S.C. § 3701), and most recently, by the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015 (28 U.S.C. § 2461), as provided in 40 C.F.R. Part 19.

131.   Pursuant to EPCRA Section 325(c), 42 U.S.C. § 11045(c), and 40 C.F.R. Part 19, Defendant is liable for a civil penalty for the EPCRA violations alleged in this Complaint of up to $58,328 per day for each violation.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, the United States, respectfully requests that this Court grant the following relief:

1.   Enter judgment finding Defendant is liable for the foregoing violations;

2.   Assess civil penalties against Defendant in amounts not to exceed those provided pursuant to CAA Section 113(b), 42 U.S.C. § 7413(b), and EPCRA Section 325(c), 42 U.S.C. § 11045(c);

3.   Order Defendant to take appropriate steps as may be necessary to remedy any ongoing violations;

4.   Award the United States its costs in this action; and

5.   Grant such other and further relief as the Court deems just and proper.

Respectfully submitted this 31st day of August, 2021.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

TODD KIM
Assistant Attorney General
Environment and Natural Resources
Division

/s/ David L. Dain
DAVID L. DAIN
Senior Counsel
Environmental Enforcement Section
Environment & Natural Resources Division
U.S. Department of Justice
999 18th Street, South Terrace, Suite 370
Denver, Colorado
(303) 844-7371
David.Dain@usdoj.gov

JOSEPH  H. HARRINGTON
Acting United States Attorney
Eastern District of Washington
JOHN T. DRAKE
Assistant United States Attorney
Eastern District of Washington
920 W. Riverside Ave, # 300
Spokane, WA  99201
(509) 835-6347
jtdrake@usa.doj.gov