UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>MULTISTAR INDUSTRIES, INC.,<br><br>Defendant. | NO. 2:21-CV-0262-TOR<br><br>FINDINGS OF FACT AND CONCLUSIONS OF LAW |

The Court held a bench trial on July 17, 2023. Andrene E. Dabaghi, Katherine L. Matthews, and Brandon Cobb appeared on behalf of Plaintiff United States of America. Michael B. Gillette appeared on behalf of Defendant Multistar Industries, Inc. The Court has reviewed the record and files herein, considered the evidence, testimony, and the parties' arguments, and is fully informed.

Pursuant to Federal Rule of Civil Procedure 52(a), below are the Court's Findings of Fact and Conclusions of Law. To the extent a finding of fact or conclusion of law is deemed the opposite, the label the Court places on the finding does not control.

FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 1

## JURISDICTION

This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1345, 1355; Clean Air Act ("CAA") Section 113(b), 42 U.S.C. § 7413(b); and the Emergency Planning and Community Right-to-Know Act ("EPCRA") Section 325(c)(4), 42 U.S.C. § 11045(c)(4).  The Court has personal jurisdiction over the parties.

## BACKGROUND

The Court has already ruled on summary judgment that Multistar Industries, Inc. ("Multistar") is liable for Claims 1, 2, and 5 under CAA Section 112(r) and for Claims 6 and 7 under EPCRA.  ECF No. 56.  The Court herein incorporates by reference the Order Granting Plaintiff's Motion for Partial Summary Judgment.  *Id*.  Thus, the bench trial only related to liability for Claims 3 and 4, and to the appropriate remedy for Claims 1–7.

The following facts were agreed upon by the parties and required no proof:

1. Multistar is a Washington corporation that owns a business at 101 West Fir Street in Othello, Washington.

2. Eastman Chemical Company ("Eastman") manufactures trimethylamine ("TMA") in Pace, Florida, for Moses Lake Industries, its customer located in Moses Lake, Washington.

3. Eastman ships TMA sold to Moses Lake Industries by rail carriers to Multistar. The TMA is stored at Multistar in Eastman's rail cars until Eastman directs Multistar to deliver it to Moses Lake Industries. Multistar then transloads the TMA from Eastman's rail cars to a Multistar cargo tank motor vehicle, which delivers the TMA to Moses Lake Industries.

4. In December 2017, Multistar began storing more than 10,000 pounds of TMA in Eastman's rail cars located on Multistar's rail siding.

5. On March 1, 2019, EPA issued an Information Request to Multistar. ("March 2019 Information Request") regarding Multistar's TMA business. Multistar timely completed its response to EPA's March 2019 Information Request on June 6, 2019.

6. TMA is a regulated substance under CAA Section 112(r)(3), 42 U.S.C. § 7412(r)(3), and 40 C.F.R. §§ 68.3 and 68.130 when contained in a process, with a threshold quantity of 10,000 pounds.

7. TMA is also a hazardous substance under EPCRA with a threshold quantity of 10,000 pounds to trigger reporting obligations under EPCRA Section 312.

8. Multistar has identified its TMA operations under one industrial group: NAICS Code 42469, for "other Chemical and Allied Products Merchant Wholesalers" and as Program Level 3.

FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 3

9. Multistar first updated and submitted a Risk Management Plan under 42 U.S.C. § 7412(r)(7) and 40 C.F.R. § 68.190 for its TMA process on June 6, 2019.

10. On May 24, 2019, Multistar conducted a worst-case release scenario or an alternative release scenario (collectively referred to as an "off-site consequence analysis") for its TMA operations, which analysis is part of the hazard assessment required under 40 C.F.R. §§ 68.20–68.42.

11. The worst-case release scenario for TMA at Multistar's facility estimates that more than 900 people within a half-mile radius of Multistar would be exposed.

### Claim 3

12. EPA's March 2019 Information Request requested any process safety information specified in 40 C.F.R. § 68.65 for any process equipment storing or containing TMA and any process hazard analysis ("PHA") for TMA conducted pursuant to or meeting the requirements of 40 C.F.R. § 68.67, including any actions taken to address the findings and recommendations of such analysis.

13. In response to EPA's March 2019 Information Request, Multistar submitted a June 3, 2019 "Process Hazard Analysis What-If Checklist" and process safety information for the TMA Covered Process.

### Claim 4

14. EPA's March 2019 Information Request requested any written operating procedures for unloading, loading, or storing of TMA at Multistar's facility,

including procedures addressing normal operations, emergency shutdowns, and emergency operations; documentation of any training conducted at the facility with respect to operating any TMA process; written procedures for maintaining the ongoing integrity of specified TMA process equipment; and documentation of any inspections, maintenance activities, or testing conducted on the TMA process equipment at the facility.

15. In response to EPA's March 2019 Information Request, Multistar submitted an operating procedure dated June 1, 2018, and an update to that procedure dated October 10, 2018.

16. In response to EPA's March 2019 Information Request, Multistar provided some records of some employee training for the TMA Covered Process.

17. In response to EPA's March 2019 Information Request, Multistar submitted an undated document entitled "Written Procedures for Maintaining Ongoing Integrity of Process Equipment – TMA" ("TMA MI procedure") and a document entitled "Transfer Facility Record of Maintenance and Inspection" ("TMA MI record") for the TMA Covered Process.

Plaintiff called the following witnesses at trial: Javier Morales, Daniel Roper, and Erin Williams.  Defendant called one witness, Peter Vanourek.

The Court admitted Plaintiff's Exhibits 1–42, except for Exhibits 20, 24, and 25.  The Court also admitted the deposition testimony of Vanourek and Crowley

designated as Exhibits 1A and 1B.

Defendant introduced no exhibits at trial.

## DISCUSSION

### I.    FINDINGS OF FACT

The Court's written findings of fact are based on the preponderance of the evidence presented at trial.

1. Multistar has been storing more than 10,000 pounds of TMA on its rail siding since December 7, 2017 to the present.  The inventory of the TMA that Multistar stored is shown on Exhibit 35.

2. Eastman sells TMA to Moses Lake Industries and transports it by rail cars to Multistar.  Moses Lake Industries does not have rail lines next to its business. The TMA is stored at Multistar's rail siding in Eastman's rail cars until Eastman directs Multistar to unload the TMA into cargo tank motor vehicles.  Eastman paid Multistar for storage, transloading and transporting it to Moses Lake Industries. *See* Exhibits 41, 42.

3.  Multistar has stored TMA on its property in rail cars for days, weeks and up 185 days.  *See* Exhibit 8.  Multistar has stored a maximum of 696,380 pounds of TMA at its location.  *Id*. at 2.

4.  Each rail car holds up to 158,000 pounds of TMA.  Multistar's rail siding can hold 10 rail cars.

5. Each cargo tank motor vehicle can only hold up to 40,000 pounds of TMA, so it takes four loads to empty a rail car.

6. The rail cars were not attached to motive power while stored and were not "incident to shipping" because no shipping papers covered the rail cars when they were stored on Multistar's property. Further, the TMA had to be transloaded to another form of transportation when the customer, Moses Lake Industries, needed the product.

7. The Court has already found Multistar violated Plaintiff's Claims 1, 2, 5, 6, and 7. ECF No. 56. The Court finds the violation related to Claim 1 occurred from December 7, 2017 to June 3, 2019 (543 days). The Court finds the violation related to Claim 2 occurred from December 7, 2017 to May 24, 2029 (533 days). The Court finds the violation related to Claim 5 occurred from December 7, 2017 to April 13, 2021 (1,223 days). The Court finds the violation related to Claim 6 occurred from March 1, 2018 to March 1, 2019 (365 days). The Court finds the violation related to Claim 7 occurred from March 1, 2019 to June 6, 2019 (97 days).

8. Multistar did not comply with the requirements of completing a compilation of written process safety information and documenting the same as set forth at 40 C.F.R. § 68.65(c) and (d). Additionally, Multistar did not comply with the requirements of performing a process hazard analysis and documenting the

FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 7

same as set forth at 40 C.F.R. § 68.67(a)–(e).

9. The Court finds that the violations related to Claim 3 concerning compliance with 40 C.F.R. § 68.65(c) and (d) occurred from December 7, 2017 to the date of trial, July 17, 2023 (2,049 days). The Court finds that the violations related to Claim 3 concerning compliance with 40 C.F.R. § 68.67(a)–(e) occurred from December 7, 2017 to June 3, 2019 (543 days).

10. Multistar did not comply with the requirement to develop and implement written operating procedures as set forth at 40 C.F.R. § 68.69(a), and consequently did not train each employee with those operating procedures as set forth by 40 C.F.R. § 68.71(a). Additionally, Multistar did not comply with the requirements of establishing and implementing written procedures to maintain the on-going integrity of process equipment, inspection and testing as set forth at 40 C.F.R. § 68.73(a), (b), and (d)(2) and (4).

11. Multistar did not begin to train its employees until two weeks after the TMA arrived on site (TMA arrived on December 7, 2017) and did not train its employees properly before unloading the TMA and has still not documented that it has trained its employees in emergency shutdown procedures and operations according to the regulations.

12. The Court finds that the violations related to Claim 4 concerning compliance with 40 C.F.R. §§ 68.69(a), 68.71(a)(1), and 68.73(a), (b) and (d)(2)

FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 8

and (4) occurred from December 7, 2017 to the date of trial, July 17, 2023 (2,049 days).

13. The Court once again rejects Multistar's claim that the TMA was in transit while it was stored on Multistar's rail siding. No facts support such a conclusion. The TMA sat on Multistar's rail siding for weeks and months and had to be unloaded and reloaded to another vehicle for delivery. No motive power was attached to the storage rail cars and no bills of lading covered the contents of the rail cars. Multistar warehoused the TMA for Eastman and was paid to do so.

14. The Court rejects Multistar's claim of good faith in researching the law. Multistar admitted that it inquired of counsel and counsel advised it to comply with the EPA's directives.

15. Multistar provided no testimony or evidence to support a mitigation of the penalty provided by law.

16. The Court has considered the following factors in determining the size of the penalty: the size of the business, the economic impact of the penalty on the business, the violator's full compliance history and good faith efforts to comply, the duration of the violation as established by any credible evidence (including evidence other than the applicable test method), payment by the violator of penalties previously assessed for the same violation, the economic benefit of noncompliance, the seriousness of the violation, and such other factors as justice

may require.

17. The Court was not presented with any evidence about the size of Multistar's business. While it appears to be a small business with about 10 employees, the Court has no idea about its financial strength.

18. Again, the Court was not presented with any evidence about the financial impact the penalty will incur upon Multistar.

19. While Multistar has appeared to comply with its other obligations concerning other chemicals after several disagreements with the EPA, there have been no good faith efforts of compliance with Multistar's handling of TMA.

20. The duration of the violations are extensive, covering 6,859 days.

21. No prior penalties have been paid for the TMA violations.

22. Multistar has received a minor economic benefit for non-compliance compared to the penalties that can be imposed.

23. The violations are extremely serious. While no TMA has knowingly escaped from Multistar's facility, TMA is highly flammable and deadly. It places workers lives at risk as well as the lives of the people in the community.

24. Such other factors as justice may require include Multistar's refusal to fully comply with the regulations after being put on notice.

II.   CONCLUSIONS OF LAW

1. The Clean Air Act ("CAA") Section 113(b) and implementing regulations

FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 10

require that owners or operators of Program Level 3 processes compile Process Safety Information ("PSI") so that the owners or operators of the process, and the employees involved in operating the process, identify and understand the hazards posed by the processes and substances involved. 40 C.F.R. § 68.65(a). The compilation of PSI must be completed before any Process Hazard Analysis under 40 C.F.R. § 68.67 is conducted. 40 C.F.R. § 68.65(a).

This PSI compilation must include:

- A block flow diagram or simplified process flow diagram for the TMA Covered Process that shows the transfer hose connection to the tank trailer trucks for unloading the TMA from the tank railcar. *Id*. at § 68.65(c)(1)(i).
- Process chemistry. *Id*. at § 68.65(c)(1)(ii).
- Safe upper and lower limits for items such as temperatures, pressures, flows, or compositions. *Id*. at § 68.65(c)(1)(iv).
- An evaluation of the consequences of deviations from safe upper and lower limits. *Id*. at § 68.65(c)(1)(v).
- Materials of construction for pressure relief valves, hoses, and tank railcars. *Id*. at § 68.65(d)(1)(i).
- Relief system design and basis for pressure relief valves. *Id*. at § 68.65(d)(1)(iv).

FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 11

   • Design codes and standards employed.  *Id*. at § 68.65(d)(1)(vi).

   • Material and energy balances.  *Id*.at § 68.65(d)(1)(vii).

   • Safety systems, such as interlocks, detection systems, or suppression systems.  *Id*. at § 68.65(d)(1)(viii).

  2. The owner or operator of a Program Level 3 covered process must develop and implement written operating procedures that provide clear instructions for safely conducting activities involved in each covered process consistent with PSI.  40 C.F.R. § 68.69(a).  The written operating procedures must address each operating phase of the process, operating limits, safety and health considerations, and safety systems and their functions.  40 C.F.R. § 68.69(a).

  Multistar was required to compile these procedures prior to December 7, 2017, when it began storing and handling over 10,000 pounds of TMA at its facility.

  3. Multistar has violated the Clean Air Act, 42 U.S.C. § 7412(r), its implementing regulations and the Emergency Planning and Community Right-to-Know Act (EPCRA), 42 U.S.C. § 11022.

  4. Congress set the maximum penalty for violations of the Clean Air Act at $117,468 per day and EPCRA at $67,544 per day.  *See* 40 C.F.R. § 19.4.  Multistar's liability spans some 6,397 days under the CAA and 462 days under EPCRA.  A rough calculation results in a maximum penalty of some

FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 12

$782,648,124.00. Plaintiff seeks $1,028,850 in penalties ($150 per day for both violations).

5. By statute, when determining the penalty to be assessed, the Court "shall take into consideration (in addition to such other factors as justice may require) the size of the business, the economic impact of the penalty on the business, the violator's full compliance history and good faith efforts to comply, the duration of the violation as established by any credible evidence (including evidence other than the applicable test method), payment by the violator of penalties previously assessed for the same violation, the economic benefit of noncompliance, and the seriousness of the violation." 42 U.S.C. § 7413(e)(1).

6. The penalty factors are applied considering the twin purposes of a regulatory penalty: retribution (punishment) and deterrence, with deterrence being both general and specific. *See, e.g.*, *Tull v. United States*, 481 U.S. 412, 422–24 (1987). Because the purpose of civil penalties goes beyond mere restitution, the penalty amount is not limited to damages actually suffered as a result of the violations. *Id.* at 422. Instead, the penalty amount must be "large enough to hurt," and to deter future violations not only by the violator itself but by the general population regulated by the Act.

## CONCLUSION

The Court has fully considered the statutory factors and the interest of

1  justice and comes to the conclusion that a monetary penalty of $850,000 is

2  sufficient to achieve the retribution and deterrence purposes. This amount

3  essentially results in a penalty of nearly $125.00 a day for the multiple violations.

4  The Court has fully considered Multistar's conduct and the seriousness of the

5  violation in arriving at this amount.

6  The Court will also impose an injunction upon Multistar to assure

7  compliance with the statutes and regulations for the next 5 years.

8  **ACCORDINGLY, IT IS HEREBY ORDERED:**

9  1. The Court rules in favor of Plaintiff on Claims 1 through 7 and imposes a

10  $850,000 penalty against Multistar Industries, Inc. This penalty is

11  payable to the United States Treasury and if payment is not timely made,

12  interest accrues pursuant to 28 U.S.C. § 1961.

13  2. The Court also enters the Order Granting Injunction which accompanies

14  these Findings of Fact and Conclusions of Law.

15  **IT IS SO ORDERED.** The District Court Clerk is directed to enter this

16  Order and Judgment accordingly, enter the Order Granting Injunction, provide

17  copies to counsel, and **CLOSE** the file subject to reopening.

18  DATED August 1, 2023.



THOMAS O. RICE
United States District Judge

FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 14